UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
GEORGE S. BOLEY,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )   Civil Action No. 13-89 (RBW)
                                    )
ATLANTIC MONTHLY GROUP, and         )
JEFFREY GOLDBERG,                   )
                                    )
            Defendants.             )
_____)

# MEMORANDUM OPINION

Plaintiff George S. Boley, proceeding pro se, brings this defamation action against the Atlantic Monthly Group, Inc. (the "Atlantic Group") and one of its employees, Jeffrey Goldberg. See Complaint ("Compl.") ¶¶ 20-32. Currently before the Court is the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and special motion to dismiss under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010 (the "Anti-SLAPP Act"), D.C. Code § 16-5502(a) (2012). Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that the defendants' special motion to dismiss must be granted.

---

[1] In addition to those already identified, the Court considered the following submissions in rendering its decision: Defendants the Atlantic Monthly Group, Inc. and Jeffrey Goldberg's Memorandum of Points and Authorities in Support of Motion to Dismiss and Special Motion to Dismiss Plaintiff's Complaint ("Defs.' Mem."); the Plaintiff's Opposition to Defendants' Motion to Dismiss and Special Motion to Dismiss the Plaintiff's Complaint ("Pl.'s Opp'n"); and Defendants the Atlantic Monthly Group, Inc. and Jeffrey Goldberg's Reply Memorandum of Points and Authorities in Support of Motion to Dismiss and Special Motion to Dismiss Plaintiff's Complaint ("Defs.' Reply").

## I. Background

Boley was formerly a public official in the Republic of Liberia, where he held positions including "Minister of State, Minister of Education and Minister of Post and Telecommunications."  Compl. ¶ 4.  He also served as chairman of the Liberia Peace Council during the Liberian Civil War in the early 1990s, a group which Boley claims sought "to find an amicable end to the civil war."  Id. ¶¶ 16, 18.

The Atlantic Group publishes a monthly magazine, The Atlantic, which is widely distributed in print and online.  Id. ¶ 5.  Goldberg is a national correspondent for The Atlantic.  Id. ¶ 6.

Goldberg made comments about Boley in two separate articles published on The Atlantic's website on January 27, 2010, and February 11, 2010.  See id. ¶¶ 20-21.  Boley's complaint excerpts the following passage from the January 27, 2010 article:

> Some news out of New York.  George Boley, a warlord I first met when covering the Liberian civil war in the mid-90s, and who later moved to New York, was arrested January 15th by U.S. Immigration and Customs and is now sitting in a jail cell in upstate Batavia.  So far, he's being charged administratively, with lying in order to gain entry into the U.S., and with committing extrajudicial killings while in another country.  Other branches of Homeland Security, I've been told, are looking at charging him with actual war crimes, which is a good thing, because he belongs in the Hague with his fellow warlord, Charles Taylor.
>
> . . . I knew, from firsthand observation, that his organization, the grossly-misnamed Liberian Peace Council, recruited and armed child soldiers; fed them drugs; and ordered them to rape and kill.

Id. ¶ 20 (citing Jeffrey Goldberg, George Boley, Liberian Warlord, Is Finally Under Arrest, The Atlantic (Jan. 27, 2010), http://www.theatlantic.com/international/archive/2010/01/george-boley-liberian-warlord-is-finally-under-arrest/34330/ (last visited June 11, 2013) ("January 27, 2010 article")).  The complaint also excerpts the following passage from Goldberg's February 11, 2010 article, in which Goldberg commented on a separate story discussing an alleged

relationship between a controversial Liberian figure, Charles Taylor, and Reverend Pat Robertson:

> You should pardon the expression, but, Christ.  Charles Taylor is an evil man, more evil than my own personal Liberian warlord, George Boley.[2]  I suppose I shouldn't be surprised by Pat Robertson, but this is fairly unbelievable.

Id. ¶ 21 (citing Jeffrey Goldberg, Pat Robertson, Friend of Warlords, The Atlantic (Feb. 11, 2010), http://www.theatlantic.com/international/archive/2010/02/pat-robertson-friend-of-warlords/35750/ (last visited June 11, 2013) ("February 11, 2010 article")).  Alleging that the foregoing statements were defamatory, Boley instituted this action on January 22, 2013, asserting common law claims against the defendants for defamation per se and defamation per quod.  See id. ¶¶ 22-32.

The defendants have now filed a motion to dismiss under Rule 12(b)(6) and a special motion to dismiss under the Anti-SLAPP Act, which authorizes the preliminary dismissal of meritless defamation lawsuits challenging speech on matters of public concern.  Because the Anti-SLAPP Act instructs courts to address special motions to dismiss on an expedited basis, see D.C. Code § 16-5502(d), the Court gives that motion priority and will address it first.[3]

## II. Special Motion to Dismiss under the Anti-SLAPP Act

**A.    Applicability of the Anti-SLAPP Act in Federal Diversity Actions**

As a threshold matter, Boley argues that the Anti-SLAPP Act's special motion to dismiss provisions do not apply in federal proceedings where, as here, the court's jurisdiction is based on diversity.  Pl.'s Opp'n at 22; see Compl. ¶ 1 (invoking the Court's diversity jurisdiction).  He

---

[2] The text of "George Boley" in this online article contains a hyperlink to Goldberg's January 27, 2010 article on Boley.

[3] Since the Court ultimately grants the defendants' special motion to dismiss, it has no occasion to reach the merits of the defendants' Rule 12(b)(6) motion.

3

relies exclusively on 3M Co. v. Boulter, in which another member of this Court held that the Anti-SLAPP Act "squarely attempts to answer the same question that [Federal Rules of Civil Procedure] 12 and 56 cover and, therefore, cannot be applied in a federal court sitting in diversity." 842 F. Supp. 2d 85, 102 (D.D.C. 2012) (Wilkins, J.).

While thoroughly reasoned, 3M Co. conflicts with the weight of authority. Indeed, three federal circuit courts have deemed it necessary to enforce state anti-SLAPP laws in diversity actions, finding no conflict between those statutes' special motion to dismiss provisions and Federal Rules of Civil Procedure 12 and 56. See Godin v. Schencks, 629 F.3d 79, 81 (1st Cir. 2010); U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 973 (9th Cir. 1999); Henry v. Lake Charles Am. Press, LLC, 566 F.3d 164, 169 (5th Cir. 2009) (summarily adopting Newsham's reasoning). Finding these cases persuasive, the Court adopts their reasoning and therefore will apply the Anti-SLAPP Act's special motion to dismiss provisions in this case. See Farah v. Esquire Magazine, Inc., 863 F. Supp. 2d 29, 36 n.10 (D.D.C. 2012) (Collyer, J.) (reaching same conclusion).

**B.    The Anti-SLAPP Act**

The subsection of the Anti-SLAPP Act governing special motions to dismiss provides in pertinent part:

> (a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.
>
> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

D.C. Code § 16-5502(a)-(b).

The "broad" protections afforded by the Act "follow[] 'the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaged in protected actions'" by enacting anti-SLAPP laws. Farah, 863 F. Supp. 2d at 36 (quoting Rep. of the D.C. Comm. on Public Safety and the Judiciary on Bill 18-893 (Nov. 19, 2010) ("Comm. Report") at 4). These statutes, like the District of Columbia's Anti-SLAPP Act, reflect a legislative judgment that

> SLAPPs . . . have been increasingly utilized over the past two decades as a means to muzzle speech or efforts to petition the government on issues of public interest. Such cases are often without merit, but achieve their filer's intention of publishing or preventing opposing points of view, resulting in a chilling effect on the exercise of constitutionally protected rights. Further, defendants of a SLAPP must dedicate a substantial[] amount of money, time, and legal resources. The impact is not limited to named defendants['] willingness to speak out, but prevents others from voicing concerns as well.

Comm. Report at 1. The Anti-SLAPP Act seeks to address these concerns "by incorporating substantive rights that allow a defendant to more expeditiously, and more equitably, dispense of a SLAPP." Id.

In construing the Anti-SLAPP Act, this Court unfortunately has no guidance from the D.C. Court of Appeals, which, to date, has not issued a published opinion interpreting the statute. Where, as here, "the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994). With this principle in mind, the Court deems it noteworthy that the Committee Report prepared in connection with the Anti-SLAPP Act emphasizes that the law was designed to "follow[] the model set forth in a number of other jurisdictions," Comm. Report at 1, and that the D.C. Court of Appeals often accords significant weight to such reports, see, e.g., Dist. of Columbia v. Place, 892 A.2d 1108, 1113-15 (D.C. 2006). Where appropriate, then, the Court

5

will look to decisions from other jurisdictions (particularly those from California, which has a well-developed body of anti-SLAPP jurisprudence) for guidance in predicting how the D.C. Court of Appeals would interpret its own anti-SLAPP law.

C.     **Merits of the Defendants' Motion**

   1.     **Prima Facie Showing of Protected Activity**

For the defendants' motion to prevail, they must initially make a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." § 16-5502(b). The Act defines an "[a]ct in furtherance of the right of advocacy on issues of public interest" to include:

> (A) Any written or oral statement made:
>
>> (i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or
>>
>> (ii) In a place open to the public or a public forum in connection with an issue of public interest; or
>
> (B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

§ 16-5501(1)(A)-(B). The Act further defines an "[i]ssue of public interest" to mean "an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place." § 16-5501(3).

Here, the defendants have made a prima facie showing that Goldberg's allegedly defamatory statements are protected under several provisions of the Anti-SLAPP Act. See Defs.' Mem. at 23-24. To begin with, all of Goldberg's statements about Boley qualify as "written . . . statement[s] made . . . [i]n a place open to the public or a public forum in connection with an issue of public interest." § 16-5501(1)(A)(ii). The Atlantic's website is a "place open to

6

the public," as anyone with internet access can view it. See Farah, 863 F. Supp. 2d at 38 (holding that statements in internet blog posting were "made in a 'place open to the public or a public forum'" (quoting § 16-5501(1)(A)). And Goldberg's statements about Boley concerned an issue of public interest because Boley is a "public figure." See § 16-5501(3). Indeed, as his complaint acknowledges, Boley is a "prominent" former public servant who held several high-level positions in the Liberian government and even ran (unsuccessfully) for President of that country. Compl. ¶¶ 4, 15-16, 19. Although the Anti-SLAPP Act does not define "public figure," this is a term of art in the context of constitutional defamation law,[4] and, as will be explained below, Boley qualifies as a "limited purpose public figure" under that body of law. See infra at 15-17. Even setting aside whether Boley qualifies as a "public figure," the Court finds that statements concerning the alleged commission of war crimes by a former high-level foreign official and that official's subsequent arrest, investigation, and administrative charging by federal authorities are quintessentially matters of public rather than private interest. For these same reasons, all of Goldberg's statements about Boley—including his comments that Boley is an "evil" "warlord" who "belongs in the Hague"—also qualify for protection as "other expression . . . communicating views to members of the public in connection with an issue of public interest." § 16-5501(1)(B).

In addition, Goldberg's statements regarding ICE's arrest, investigation, and administrative charging of Boley plainly qualify as "written . . . statement[s] made . . . [i]n connection with an issue under consideration or review by [an] . . . executive . . . body." § 16-5501(1)(A)(i); see Lafayette Morehouse, Inc. v. Chron. Publ'g Co., 44 Cal. Rptr. 2d 46, 51 (Cal.

---

[4] See FAA v. Cooper, __ U.S. __, __, 132 S. Ct. 1441, 1449 (2012) ("[I]t is a 'cardinal rule of statutory construction' that, when [a legislature] employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" (citation omitted)).

7

Ct. App. 1995) (interpreting identically-worded provision in California anti-SLAPP statute and holding that newspaper's statements regarding issues under consideration by county board of supervisors and federal courts were covered by the provision), cited approvingly in Briggs v. Eden Council for Hope & Opportunity, 969 P.2d 564, 571 (Cal. 1999); Braun v. Chron. Publ'g Co., 61 Cal. Rptr. 2d 58, 61-62 (Cal. Ct. App. 1997) (reaching same conclusion regarding newspaper articles reporting on an investigative audit).

### 2. Likelihood of Success on the Merits

Because the defendants have made a prima facie showing that Boley's defamation claim "arises from an act in furtherance of the right of advocacy on issues of public interest," the burden now shifts to Boley "to demonstrate[] that the claim is likely to succeed on the merits." § 16-5502(b). The Anti-SLAPP Act does not define the contours of this standard, so the Court again views as instructive pertinent caselaw from California. There, a plaintiff seeking to show "a probability of prevailing on a claim" in response to an anti-SLAPP motion "must satisfy a standard comparable to that used on a motion for judgment as a matter of law." Price v. Stossel, 620 F.3d 992, 1000 (9th Cir. 2010). Thus, a plaintiff is required to "'demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" Id. (citation omitted). If "'a plaintiff presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff,'" the "'anti-SLAPP motion should be granted.'" Id. (citation omitted).

> To prevail on a defamation claim under District of Columbia law, a plaintiff must prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable

> as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005) (quotation marks and citation omitted). "Normally the issue of privilege antecedes the question whether a communication is capable of defamatory meaning." White v. Fraternal Order of Police, 909 F.2d 512, 527 (D.C. Cir. 1990). Accordingly, the Court first considers whether Goldberg's allegedly defamatory statements are privileged.

### i. Privilege

The defendants contend that Goldberg's statements are protected by the fair report privilege. Defs.' Mem. at 11. "There is no question that, as a matter of District of Columbia law, publications do enjoy a conditional fair report privilege," which shields "fair and accurate reports of official proceedings." Dameron v. Wash. Mag., Inc., 779 F.2d 736, 739 (D.C. Cir. 1985). "'The basis of the privilege is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings.'" Id. (citation omitted). "Under applicable District of Columbia law, a defendant must 'clear[] two major hurdles' to qualify for the fair report privilege." Jankovic v. Int'l Crisis Grp., 593 F.3d 22, 26 (D.C. Cir. 2010) (quoting Phillips v. Evening Star Newspaper Co., 424 A.2d 78, 89 (D.C. 1980)). A defendant "must show, first, that [the] publication was a 'fair and accurate report' of a qualified government source, and, second, that the publication properly attributed the statement to the official source." Id.

Goldberg's statements describing ICE's arrest, investigation, and administrative charging of Boley, see Compl. ¶ 20, are protected by the fair report privilege. First, these statements concerned a "governmental proceeding" to which the privilege applies. See White, 909 F.2d at 527 (privilege applies broadly to "reports of any official proceeding or action taken by any

9

officer or agency of government" (quoting Phillips, 424 A.2d at 88) (emphasis omitted)).

Second, official ICE documents filed in a habeas action instituted by Boley challenging his detention (the authenticity of which Boley does not dispute) reveal that Goldberg's statements were a "fair and accurate report" of the ICE removal proceeding. Compare Compl. ¶ 20 (citing as defamatory Goldberg's statements that Boley "was arrested January 15th[, 2010] by U.S. Immigration and Customs and is now sitting in a jail cell in upstate Batavia," that "he's being charged administratively, with lying in order to gain entry into the U.S., and with committing extrajudicial killings while in another country," and that "[o]ther branches of Homeland Security . . . are looking at charging him with actual war crimes"), with Boley v. Phillips, No. 6:12-6016, ECF No. 4-2, at 4 (W.D.N.Y. March 14, 2012) (ICE letter confirming that Boley was taken into ICE custody on January 15, 2010); id. at 10-12 (ICE "Notice to Appear," dated January 15, 2010, charging Boley with numerous extrajudicial killings in Liberia and failure to possess valid documentation for entry into the United States); id. at 20-21 (ICE "Additional Charges of Inadmissibility/Deportability," dated August 11, 2010, charging Boley with recruitment or use of child soldiers in Liberia); see also Defs.' Mem., Declaration of Micah J. Ratner ("Ratner Decl."), Exhibit ("Ex.") 6 (March 30, 2012 ICE News Release) (announcing that Boley, "[t]he former leader of the Liberian Peace Council (LPC) who committed human rights abuses during the Liberian civil war in the 1990s[,] was deported to his native country Friday, capping an effort by U.S. Immigration and Customs Enforcement (ICE) to investigate the case and win the former warlord's removal from the United States"). And third, Goldberg specifically attributed the statements to ICE "in such a manner that the average reader would be []likely to understand [them] . . . to be a report on or summary of an official document or proceeding." Dameron, 779 F.2d at 739. As in White, Goldberg's statements accurately "summarized the gist of the

allegations" advanced by ICE, and "consistently attributed the reported facts" to the pending ICE proceeding. 909 F.2d at 528. The statements are therefore privileged.

The Court next turns to Goldberg's statement that he "knew, from firsthand observation, that [Boley's] organization, the grossly-misnamed Liberian Peace Council, recruited and armed child soldiers; fed them drugs; and ordered them to rape and kill." Compl. ¶ 20. Boley asserts that this statement "cannot be attributed to any official source." Pl.'s Opp'n at 18. Boley's argument might be convincing based solely on the excerpt provided in his complaint, which depicts Goldberg's statement as presenting "historical fact[s] without any indication that the statement[ was] intended as a summary of an official [proceeding or] document." White, 909 F.2d at 528; see Dameron, 779 F.2d at 740.

But the complaint misleadingly takes Goldberg's statement out of context. The excerpt highlighted by Boley is cherry-picked from the following passage from Goldberg's article:

> I've been involved with Boley's case for a little while. I was subpeonaed by a human rights group in Minnesota, the Advocates for Human Rights, to testify against Boley in a defamation lawsuit that he himself filed against the group (the definition of chutzpah, by the way). I eventually provided a sworn affadavit in the case, in which I detailed what I knew of Boley's activities in the civil war, which is a lot -- I knew, from firsthand observation, that his organization, the grossly-misnamed Liberian Peace Council, recruited and armed child soldiers; fed them drugs; and ordered them to rape and kill. For starters. (The lawsuit, unsurprisingly, was dismissed earlier this month.)

January 27, 2010 article. Viewed in context, then, Goldberg's allegedly defamatory statement merely described an affidavit he submitted in an official proceeding, i.e., a civil lawsuit filed by Boley. The fair report privilege applies to summaries of statements made in connection with judicial proceedings, see Liberty Lobby, Inc. v. Dow Jones & Co., Inc., 838 F.2d 1287, 1299 (D.C. Cir. 1988); Johnson v. Johnson Publ'g Co., 271 A.2d 696, 698 (D.C. 1970), even when it is the defendant's summary of his own prior testimony, see Rosenberg v. Helinski, 616 A.2d

11

866, 875-76 (Md. 1992). And Goldberg's statement fairly and accurately described his affidavit with proper attribution to the court document. Compare January 27, 2010 article, with Boley v. Minn. Advocates for Human Rights, No. 08-5908, ECF No. 20 (D. Minn. Nov. 20, 2009) (Affidavit of Jeffrey Goldberg). Thus, the statement is protected by the fair report privilege.[5]

Goldberg also opined that the government's investigation and potential charging of Boley for war crimes was a "good thing[] because he belongs in the Hague." Compl. ¶ 20. This comment, while exceeding the bounds of the fair report privilege, falls within the scope of a separate, "freestanding doctrine under District of Columbia law": the "fair comment" privilege. Jankovic, 593 F.3d at 177. This "long recognized" doctrine "accord[s] the media the privilege of fair comment on matters of public interest," so long as the opinions expressed are based on true facts. Phillips, 424 A.2d at 88; see Jankovic, 593 F.3d at 177; Wash. Times Co. v. Bonner, 86 F.2d 836, 841 n.4 (D.C. Cir. 1936). Such statements are not actionable in defamation "[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts." Moldea v. New York Times Co., 15 F.3d 1137, 1145 (D.C. Cir. 1994) ("Moldea I"), rev'd in part on reh'g, 22 F.3d 310 (D.C. Cir. 1994) ("Moldea II"). Here, Goldberg's statement expressed his personal opinion on a matter of public concern, and was based on a fact that is undisputed as true in this case, i.e., that the federal government was investigating Boley in January 2010 for committing war crimes abroad. The statement is accordingly protected as fair comment.

---

[5] It bears noting that the statements in Goldberg's affidavit are themselves absolutely privileged under District of Columbia law. See Oparaugo, 884 A.2d at 79 (recognizing an "absolute privilege" for statements made in the course of judicial proceedings).

Other aspects of Goldberg's allegedly defamatory statements do not appear to be within the scope of any privilege—namely his characterizations of Boley as "evil" and a "warlord." Compl. ¶¶ 20-21. Nevertheless, as explained below, these statements do not give rise to a meritorious defamation claim.

### ii. Goldberg's Characterization of Boley as "Evil"

When evaluating the merits of a defamation claim, courts must address two threshold questions of law: "whether the disputed [publication] (1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place [the plaintiff] in an offensive false light." Weyrich v. New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001); Moleda II, 22 F.3d at 316-17. Regarding this first requirement, the Circuit has explained that a statement must "at a minimum express or imply a verifiably false fact about" the plaintiff in order to be "actionable under the First Amendment." Weyrich, 235 F.3d at 624. This principle seeks to assure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 (1990) (quoting Hustler Magazine v. Falwell, 485 U.S. 46, 53-55 (1988)).

As the defendants point out, Defs.' Reply at 5, Goldberg's characterization of Boley as "evil" is not a verifiable statement of fact, see Underwager v. Channel 9 Australia, 69 F.3d 361, 367 (9th Cir. 1995) (statement that plaintiff was "intrinsically evil" was not "not capable of verification" and thus was not actionable). This is precisely the sort of "imaginative expression" and "rhetorical hyperbole" that the First Amendment protects. Consequently, the statement is not actionable in defamation.

### iii. Goldberg's Characterization of Boley as a "Warlord"

Goldberg repeatedly referred to Boley as a "warlord" in his two Atlantic articles. See Compl. ¶¶ 20-21. The defendants do not appear to dispute that this term expresses a verifiable statement of fact that is capable of defamatory meaning. However, assuming without deciding that these threshold requirements are satisfied, the Court concludes that Boley's defamation claim based on Goldberg calling him a "warlord" is not likely to succeed on the merits because there is no indication that the statement was false or made with actual malice.

Reflecting our "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," the First Amendment sets a high bar for "public figures" to recover for defamation. New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). Specifically, a public figure may prevail in a defamation suit only if he can produce "clear and convincing evidence" that the challenged publication was made with "actual malice"—i.e., with "knowledge that it was false or with reckless disregard of whether it was false or not." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510 (1991).

"The Supreme Court has identified two classes of public figures in addition to government officials: general purpose and limited purpose public figures."[6] Tavoulareas v. Piro, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc). "A person becomes a general purpose public figure only if he or she is 'a well-known celebrity, his name a household word.'" Id. (citation omitted). "Few people," however, "attain the general notoriety that would make them public figures for all purposes." Waldbaum v. Fairchild Publn's, Inc., 627 F.2d 1287, 1296 (D.C. Cir.

---

[6] Some courts have indicated that foreign government officials qualify as public officials for the purpose of constitutional defamation analysis, regardless of their status as general or limited purpose public figures. E.g., Desai v. Hersh, 719 F. Supp. 670, 673-74 (N.D. Ill. 1989); Sharon v. Time, Inc., 599 F. Supp. 538, 563 (S.D.N.Y. 1984). Because the Court ultimately finds that Boley is a limited purpose public figure, it need not address whether his status as a former official of a foreign government alone makes him a public official subject to the heightened "actual malice" standard of fault.

14

1980). Much more common are "public figures for the more limited purpose of certain issues or situations." Tavoulareas, 817 F.2d 7at 772. "Whether (and to what extent) a person is a public figure is a matter of law for the court to decide." Id.

Here, Boley has not achieved the level of notoriety necessary to qualify as a general purpose public figure, so the Court will consider whether he is a limited purpose public figure.

### a. Limited Purpose Public Figure

In Waldbaum, the Circuit "formulated a three-part test for identifying a limited-purpose public figure, requiring (1) that there have been a public controversy; (2) that the plaintiff have played a sufficiently central role in the controversy; and (3) that the alleged defamatory statement have been germane to the plaintiff's participation in the controversy." Clyburn v. News World Commc'ns, Inc., 903 F.2d 29, 31 (D.C. Cir. 1990) (citing Waldbaum, 627 F.2d at 1296-98). Each Waldbaum requirement is satisfied here.

First, there was a public controversy concerning the Liberian Civil War. The issue garnered attention from the United States Department of State, which published a detailed report describing the "flagrant disregard for human rights by the 40,000 to 60,000 fighters in the major factions" involved in the war. Defs.' Mem., Ratner Decl., Ex. 1 (March 1996 Department of State Report entitled "Liberia Human Rights Practices, 1995" ("State Department Report")) at 2. It has also received substantial press coverage internationally, and became the subject of at least one widely-published book. See Stephen Ellis, The Mask of Anarchy: The Destruction of Liberia and the Religious Dimension of an African Civil War (1999). Thus, "persons actually were discussing [the] specific question," and "the press was covering" it. Waldbaum, 627 F.2d at 1297. And certainly a national civil war involving widespread reported abuses of human

rights is no isolated matter.  Such events instead have "foreseeable and substantial ramifications" for both participants and nonparticipants alike.  See id.

Second, Boley played a sufficiently central role in the controversy.  Boley acknowledges that during the Liberian Civil War he was chairman of the "Liberia Peace Council," which he claims sought to find an "amicable end to the civil war" through peaceful negotiation.[7]  Compl. ¶¶ 16, 18.  As Boley himself stated, he felt compelled to become involved because, "[a]s a prominent Liberian," he could "not sit on the sidelines and allow the carnage to continue."  Id. ¶ 15.  "[B]y purposely trying to influence the outcome" of the Liberian Civil War, Boley thrust himself into the forefront of the controversy.  See Waldbaum, 627 F.2d at 1297.  At the very least, Boley "could realistically have been expected, because of his position in the controversy, to have an impact on its resolution."  See id.  Indeed, that is precisely what Boley states he attempted to do: impact the resolution of the civil war through his stature as a prominent Liberian.

Boley suggests that his actions in Liberia did not make him a public figure in the United States.  See Pl.'s Opp'n at 4.  But this argument overlooks that a limited purpose public figure is defined "not in terms of geography but in terms of the controversy that he has stepped into." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 20 (1st Cir. 2011) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974); Tavoulareas, 817 F.2d at 772).  As indicated, the controversy at issue here—the Liberian Civil War—stretched beyond that country's borders, garnering attention from the United States government and the global press.  Because Boley admittedly "exposed [himself] to increased risk of injury from defamation" on the topic of the

---

[7] The State Department found otherwise.  See Defs.' Mem., Ratner Decl., Ex. 1 (State Department Report) at 3 ("There were credible reports that George Boley," in his capacity as the leader of the Liberia Peace Council, "authorized the summary execution of seven of his fighters November 14 for harassment of civilians.  Boley did not deny these allegations.").

Liberian Civil War and its attendant human rights abuses, see Lohrenz v. Donnelly, 350 F.3d 1272, 1280 (D.C. Cir. 2003), the second Waldbum requirement is satisfied.

Third, the allegedly defamatory statement—Goldberg's characterization of Boley as a "warlord"—directly concerned Boley's involvement in the Liberian Civil War. In his January 27, 2010 article, Goldberg indicated that he was calling Boley a warlord based upon his firsthand experience with Boley "when covering the Liberian civil war in the mid-90s." And in referring to Boley as a warlord in his February 11, 2010 article, Goldberg provided a hyperlink to his January 27, 2010 article, thus incorporating that article by reference and providing the necessary context for the allegedly defamatory remark.

Accordingly, the Court concludes that the Waldbaum criteria are satisfied and that Boley qualifies as a limited purpose public figure.

### b. Falsity and Actual Malice

"Where a public figure . . . pursues a libel action, first amendment requirements supplant . . . the common law of defamation . . . in several respects." Liberty Lobby, Inc., 838 F.2d at 1292. "First, such a plaintiff must demonstrate by at least a fair preponderance of the evidence that the allegedy defamatory statement is false." Id. In considering the element of falsity, the Court must be mindful that "'[s]ubstantial truth' . . . is generally regarded as a defense to defamation." Moldea I, 15 F.3d at 1150. Thus, "'[i]t is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.'" Liberty Lobby, Inc., 838 F.2d at 1296 (citation omitted).

Second, the plaintiff must prove that the defendants "acted with actual malice, and not merely ordinary negligence, in publishing [the] allegedly defamatory statements about" him.

17

Lohrenz, 350 F.3d at 1282-83. To meet this burden, Boley "must show, by clear and convincing evidence, that when the defendants published the alleged defamations they were subjectively aware that it was highly probable that the story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that appellees had obvious reasons to doubt.'" Id. at 1283 (citation omitted). Courts serve an important function in assessing actual malice. As the Supreme Court has explained, "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984). "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" Id.

Because Goldberg characterized Boley as a warlord based on his own purported observations of him in Liberia, this is not a case where actual malice can be shown through a journalist's reckless reliance on an unreliable third-party source; rather, the question is whether Goldberg fabricated the story. See St. Amant v. Thompson, 390 U.S. 727, 732 (1968) (actual malice may be established by proof that the "story [was] fabricated by the defendant, or [was] the product of his imagination"). And Boley "cannot show actual malice in the abstract; [he] must demonstrate actual malice in conjunction with a false defamatory statement." Tavoulareas, 817 F.2d at 794. Furthermore, with respect both to falsity and actual malice, Boley must "'demonstrate that [his] complaint is legally sufficient and supported by a prima facie showing of

18

facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" Price, 620 F.3d at 1000 (citation omitted).

Boley has failed to make this showing. Although his complaint makes blanket denials of Goldberg's statements and denies having committed any war crimes, Compl. ¶ 23, Boley does not specifically deny that he was a "warlord" as that term is commonly defined,[8] nor does he explain why Goldberg's characterization of him as a warlord was false. See Vogel v. Felice, 26 Cal. Rptr. 3d 350, 363 (Cal. Ct. App. 2005) (in responding to anti-SLAPP motion, plaintiff "tacitly admitted the substantial truth of" allegedly defamatory statement where he merely "described . . . characterization as false, but never stated the true facts to which the statement would have to be compared in order to establish its substantial falsity"). More important, in opposing the defendants' Anti-SLAPP motion, Boley has adduced no facts indicating that the "warlord" statements were false or made with actual malice, offering only broad and conclusory denials of Goldberg's comments. The defendants, meanwhile, have pointed to evidence corroborating Boley's status as a former warlord, including the State Department Report and the findings of the ICE removal proceeding, see Defs.' Mem., Ratner Decl., Ex. 1 (State Department Report) at 3; id., Ex. 6 (March 30, 2012 ICE News Release) (referring to Boley as a "former warlord"), all of which suggests that Goldberg's statements were substantially true and made in good faith. The Court therefore concludes that Boley has failed to make a prima facie showing of facts that Goldberg's statements were false, let alone "fabrications" that support an inference of actual malice.

---

[8] See Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/warlord (last visited June 17, 2013) (defining "warlord" as "a supreme military leader" or "a military commander exercising civil power by force usually in a limited area").

### III. Conclusion

For the foregoing reasons, the Court concludes that the defendants have made a prima facie showing that Boley's defamation claim arises from an act in furtherance of the right of advocacy on issues of public interest, and that Boley has failed to demonstrate that his defamation claim is likely to succeed on the merits. Moreover, it does not appear to the Court that limited discovery would allow Boley to defeat the defendants' motion. See D.C. Code § 16-5502(c)(2) ("When it appears likely that targeted discovery will enable the plaintiff to defeat the [special] motion [to dismiss under the Anti-SLAPP Act] and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted."). Accordingly, the defendants' special motion to dismiss is granted.

**SO ORDERED** this 25th day of June, 2013.[9]

REGGIE B. WALTON
United States District Judge

---

[9] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.